CHARLES A. BROWN

*v.*

GEORGE L. CRAGG *et al.*

*Opinion filed October 23, 1907—Rehearing denied Dec. 5, 1907.*

1. PARTNERSHIP—*what must be shown to require partner to account for shares of stock.* Members of a firm of attorneys who seek to compel another member to account to them for shares of stock in a corporation issued to him and held by him personally, have the burden of proving that such stock was received in the course of the partnership business, in consideration of legal services either performed or to be performed.

2. SAME—*when law partners are not entitled to accounting for services of one partner.* The fact that one member of a firm of attorneys who was a heavy stockholder in a corporation voluntarily assisted other heavy stockholders in their efforts to sell the stock, in the mutual interest of all stockholders, does not entitle the other partners to an accounting for the value of his services in that behalf, where there is no proof that he rendered any legal services or did more than might be expected of him as a stockholder.

3. SAME—*what is not sufficient to sustain decree for overdrawn account.* The fact that upon a bill for a partnership accounting the book-keeper testifies that the complainant had overdrawn his account a certain amount does not justify a decree in favor of the defendant for such sum, where the books were not introduced in evidence and there is no proof of their contents nor of their correctness.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. M. KAVANAGH, Judge, presiding.

The appellant and appellees are lawyers, and prior to March 1, 1902, were partners, practicing their profession in Chicago, under the name of Charles A. Brown, Cragg & Belfield. On February 28, 1902, the partnership was dissolved by the retirement of appellee Belfield, and thereafter the firm, consisting of the other two members, continued the practice of law under the firm name of Charles A. Brown & Cragg. The Stromberg-Carlson Telephone Manufacturing Company of Illinois had been a client of the firm existing prior to March 1, 1902. During the latter part of 1901 and in 1902 negotiations were carried on by the stockholders of that company which resulted in a transfer of all the shares of the stock of the corporation to Eugene H. Satterlee and Thomas W. Finucane. The purchasers soon after organized a corporation under the laws of New York, known as the Stromberg-Carlson Telephone Manufacturing Company of New York, to which were transferred all the property, business and good will of the Illinois corporation. After the New York corporation was organized, in April, 1902, 340 shares of its preferred stock and 993 shares of its common stock were issued to the appellant. Soon after, the bill in this case was filed in the superior court of Cook county by the appellee Cragg, against the appellant and appellee Belfield, to require appellant to account to his partners for the stock so issued to him, as a part of the partnership earnings. It was alleged in the bill that appellant had rendered important and valuable services to the Illinois corporation, and to some of its officers and stockholders and others interested in the re-organization of said corporation, and especially to Satterlee and Finucane, which services related to the re-organization of the corporation and business of the

said Illinois corporation and to the promotion and organiza-
tion of the New York corporation, and that on March 22,
1902, the appellant entered into the following contract:

"Agreement made this 22d day of March, 1902, between
Charles A. Brown of Chicago, Illinois, and the Stromberg-Carlson
Telephone Manufacturing Company, a corporation organized un-
der the laws of the State of Illinois and having its principal office
at Chicago.

"*Witnesseth,* That the said Brown hereby covenants and agrees
to and with the said company as follows:

"*First*—That he will for a period of five years, beginning April
1, 1902, devote his services to the interests of said corporation.

"*Second*—That he will not for a period of five years, beginning
April 1, 1902, accept employment of any character hostile to the
interests of said corporation.

"*Third*—That the engagement for services shall extend to any
partnership of which the said Brown shall be a member during the
life of the contract.

"*Fourth*—That the charges for services shall be at the rate of
five dollars ($5) an hour for the time actually devoted to the ser-
vice of the Stromberg-Carlson Telephone Manufacturing Company,
and at the rate of fifty dollars ($50) for each application for pat-
ent, provided that in special cases this rate may be modified by
mutual consent upon prior notice. It shall be paid for by the
Stromberg-Carlson Telephone Manufacturing Company in addition
to payment for services.

"*Fifth*—Said Brown further agrees with said The Stromberg-
Carlson Telephone Manufacturing Company that it may assign all
its interest in this contract, subject to all the obligations of said
corporation, to any corporation hereafter organized for the purpose
of taking over the capital stock and property of the said corpora-
tion; and he covenants that he will fulfill for such corporation any
and all his obligations under this instrument not performed by him
prior to the date of said assignment.

"*Sixth*—And the said The Stromberg-Carlson Telephone Manu-
facturing Company hereby covenants and agrees to pay said Brown
each month the service charges for the preceding month, together
with all disbursements, for and during the five years hereinbefore
mentioned, and further covenants and agrees that the said Brown
shall have complete and exclusive charge of all the patent work, in-
cluding patent litigation and patent soliciting, of the Stromberg-
Carlson Telephone Manufacturing Company, and of its successors
and assigns, for and during the period of five years provided for
herein.

"In witness whereof the said Brown has hereunto affixed his
hand and seal, and the said The Stromberg-Carlson Telephone

Manufacturing Company has caused its seal to be hereto affixed and the instrument to be signed by its duly authorized directors, the day and year first above written.

CHARLES A. BROWN,<br>
THE STROMBERG-CARLSON TELEPHONE<br>
MANUFACTURING CO.,<br>
By A. L. F. Stromberg, <i>Pres.</i>"

The bill further alleged that on the same day appellant also entered into the following contract:

"Agreement made this 22d day of March, 1902, between Charles A. Brown, of Chicago, party of the first part, and Thomas W. Finucane and Eugene H. Satterlee, of Rochester, New York, parties of the second part.

"*Witnesseth:* Whereas said parties of the second part are promoting the organization of a company to be incorporated under the laws of the State of New York, to take over the capital stock or the property, or both, of the Stromberg-Carlson Telephone Manufacturing Company of Chicago, the capital of which said proposed New York State corporation is to consist of fifteen thousand (15,000) preferred shares and fifteen thousand (15,000) common shares, of the par value of one hundred dollars ($100) each; and whereas, said parties of the second part deem the contract, a copy of which is hereto annexed, to be essential to the success of the said proposed new company and of assistance in the organization thereof:

"Now, therefore, it is agreed that in consideration of the execution and delivery by party of the first part of the said contract to parties of the second part, execution and delivery of which is hereby acknowledged by parties of second part, parties of second part shall deliver to party of first part 340 preferred shares and 993 common shares of the capital stock of said new company.

"In witness whereof the said parties hereto have hereunto set their hands and seals the day and year first above written.

CHARLES A. BROWN,     (Seal)<br>
THOMAS W. FINUCANE,  (Seal)<br>
EUGENE H. SATTERLEE.  (Seal)"

It was alleged that the "service contract," as the first contract above set forth is called, is the contract mentioned in the second, called the "stock contract;" that the stock mentioned in the latter was issued to the appellant and that large dividends have been paid him thereon, and he has appropriated both stock and dividends to his personal use and

has not accounted for the same to the firm, to whom they belong. The prayer is for an accounting and distribution.

The appellant, in his amended answer, denies that he rendered to the said Illinois corporation, its officers or stockholders, or to Satterlee and Finucane, valuable services or gave advice in regard to the re-organization of said corporation or its business or in regard to the promotion and organization of the New York corporation. He admits the execution of the two contracts and the issue to him of the shares of stock, but denies that the consideration therefor was the execution of the so-called service contract or any services rendered or to be rendered by appellant, as a member of said firm, to any parties mentioned in the bill, or that either party considered or intended said shares of stock to be such consideration. He further alleged that he and his wife and father-in-law had been stockholders in the Illinois corporation, and that the 993 shares above mentioned had been bargained for in exchange for the stock of the Illinois corporation previously held by himself and his wife and father-in-law, together with certain personal obligations from said Illinois corporation to him; that the shares of preferred stock were purchased by him for cash and paid for with his personal means; that all of the arrangements for the acquisition of this stock by himself and wife were long prior to the execution of the contracts mentioned.

Belfield filed a cross-bill, similar in its allegations to the original bill. Upon a hearing a decree was entered dismissing the cross-bill and so much of the original bill as related to the shares of stock. The decree found that appellant had a right to charge the stockholders who sold their stock to Satterlee and Finucane, for legal services rendered in connection with such sale, and that a reasonable charge for such services would be $9500, which should be divided between appellant and appellee Cragg. The present appellees appealed from this decree to the Appellate Court, where appellant assigned cross-errors. The Appellate Court affirmed

the decree dismissing the cross-bill, but held that the stock was partnership property obtained during the existence of the partnership of appellant and appellee Cragg, and should be distributed according to their interests under the partnership agreement. To review the judgment of the Appellate Court a further appeal has been prosecuted to this court.

HENRY S. ROBBINS, and LOUIS SPAHN, for appellant.

JOHN MAYNARD HARLAN, HENRY M. BATES, CONRAD H. POPPENHUSEN, and JOSEPH L. McNAB, (S. S. GREGORY, of counsel,) for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

The question for determination is whether the stock in controversy was the property of appellant, Brown, individually, of Charles A. Brown & Cragg, or of Charles A. Brown, Cragg & Belfield. The answer depends upon whether or not it was acquired by appellant in the course of the partnership business, in consideration of services either performed or to be performed. The evidence is voluminous and cannot be discussed in detail within the reasonable limits of an opinion. We have carefully read it and shall refer to the salient points, not particularizing the testimony of individual witnesses.

The evidence shows that Alfred Stromberg was born in Sweden and came to this country at the age of twenty-two years. He was a practical workman of an inventive turn of mind, and previous to the formation of the Illinois corporation was employed upon line systems of telephones and worked as a mechanic. Carlson had been a fellow-workman. After they had worked together for some time they formed a corporation for the manufacture of electrical merchandise and telephone apparatus for independent companies throughout the United States. The corporation was organized under the laws of Illinois several years prior to the filing of the bill herein and had a capital stock of $50,000, of

which one-half was paid in cash and the balance by the assignment of patents to the company. The business of the corporation grew rapidly, the annual sales increasing from about $87,000 in 1895 to $925,000 in 1900. During all of this time the corporation was hard up for money with which to carry on its affairs. Neither Stromberg nor Carlson had any money at the start, and the various stockholders did not have enough capital to keep pace with the rapid increase in business. Before appellant was admitted to the bar he had been connected with the American Bell Telephone Company and with the Western Electric Company, and had managed a manufacturing plant of the latter company. After his admission to the bar he made a specialty of trade-marks, copyrights and patent law with reference to telephones. He made a success of his business and soon became an expert. After his admission to the bar, and before and after the formation of the various firms of which he was a member, he held stock in different corporations, as did also his partners, Cragg and Belfield. Each devoted more or less time to the affairs of the corporations in which they were, respectively, interested. This was no secret among the members of the firm, and was evidently considered as the private business of the respective parties and apart from the firm's business. In 1898 the appellant purchased 40 shares of the stock of the Stromberg-Carlson company and later became a director. During its rapid growth and ever-increasing demands for money he signed the bonds of the company, became surety for it and furnished money for its pay-rolls and running expenses, besides advising its officers in the management of its affairs. He was the only stockholder in the corporation of any considerable financial ability. In 1901 Stromberg and Carlson, together with the appellant and his wife and father-in-law, owned over three-fourths of the stock of the corporation, appellant and his family having more than one-fifth. Owing to the magnitude of the business of the corporation and the insufficiency of its capital it

.was necessary to make some arrangement which would make a larger amount of cash resources available for its use. Appellant and Stromberg and Carlson were desirous of selling their stock. In the fall of that year Eugene H. Satterlee and Thomas W. Finucane, of Rochester, New York, learned that it was necessary for the corporation to have assistance in the way of increased capital, and in December, or in January, 1902, they went to Chicago and there talked with Stromberg with reference to obtaining control of the corporation by the purchase of stock. They then had an interview with Stromberg, Carlson and appellant, and discussed the proposition of buying a majority or two-thirds of the stock, but finally decided that they would have to have all of it. Stromberg told them that he could get it on the basis of $15 for one invested in the stock of the old corporation, and this Satterlee and Finucane agreed to pay. In pursuance of this agreement Stromberg, Carlson and appellant obtained options from all the stockholders of the Illinois corporation but one, to whom Stromberg personally had to pay $4000 bonus for his stock. After all of the stock had been purchased, the contracts set out in the statement preceding this opinion were executed, the New York corporation was organized and the shares of stock in it were issued as mentioned in those contracts.

There is nothing in this transaction indicating that the part which appellant took in the affair was in the nature of legal services or in the performance of those duties which came within the scope of the partnership business between him, Cragg and Belfield. It was apparently nothing more nor less than a concerted effort among the heavy stockholders of the corporation to sell their stock, each helping the other to accomplish this end. The appellant was not employed by the other stockholders to sell their stock, and there were no legal services required of him or any other person on their behalf. He simply obtained from them an option, running to himself, for the purchase of their stock at the rate of $15

for one invested. The options were really for the benefit of Satterlee and Finucane, and it was so understood by the stockholders, who were told by appellant that he was selling his stock at the same price. There was no intimation on the part of appellant or any stockholder, so far as the evidence shows, that appellant was the agent or attorney of any stockholder or was to be paid for the taking of these options or the sale of the stock. Satterlee and Finucane were under no obligation to pay appellant for obtaining the options. He was a seller and they were buyers. Appellant, Stromberg and Carlson were obliged to procure all the stock for Satterlee and Finucane in order to sell their own. The Illinois corporation was under no obligation to pay appellant, for he did not render it any service. This transaction concerned not the corporation, but the stockholders. The New York corporation was not organized until April, and there can be no claim that it owed appellant for any services. There is no evidence that he rendered any service in the organization of that company and no claim that he acted as a promoter thereof. The part performed by appellant in the whole transaction is not shown to be anything more than was to be expected of him as an owner of stock dealing with a prospective purchaser. Though much time was consumed in negotiations, appellant's partners have no cause to complain, if it did not interfere with the business of the firm. (*Metcalfe* v. *Bradshaw,* 145 Ill. 124; *Northrup* v. *Phillips,* 99 id. 449.) The appellant was familiar with the business of the Illinois corporation, its assets and liabilities, the validity of its patents, the condition of its litigation, the probable liability from infringements and on bonds given to indemnify its customers and the users of its apparatus. The details of all these matters were essential to be considered by the purchasers of the stock, whose value was affected by them. The discussion of these details between the seller and buyer and negotiation and correspondence about them necessarily consumed much time, but the

seller could not charge the buyer therefor, nor could he charge another stockholder who profited thereby in the sale of his own stock, unless he had a contract with such stockholder for that purpose, and no such contract is shown. As to services performed by appellant on behalf of Stromberg, it is apparent that appellant was as much indebted to Stromberg in the transaction as Stromberg was indebted to appellant. No contract is shown by either to pay the other. They were working together for the common end of selling the stock of both.

Under the facts as they appear in this record we are unable to see why appellant should be required to account to the members of his firm for profits made in his private business with reference to this stock any more than he should be required to account for any other private transaction in which he might have engaged, apart from the business legitimately transacted within the scope of the partnership agreement. There were no services rendered by appellant for which he had a claim against any one and for which this stock could have been delivered to him. Even if appellant, Stromberg and Carlson received this stock as a bonus, in addition to the price received by the other stockholders for their shares, and divided it among them, that is no reason why a partner of one of them in another enterprise should share in the stock.

In regard to the question whether the stock was issued to appellant in consideration of services to be thereafter performed, if the so-called "stock contract" and "service contract" had not been executed no question would have arisen concerning the stock received by the appellant. Stromberg, Satterlee and appellant testify in regard to the stock contract. Their testimony is to the effect that after the agreement for the sale of the stock had been made by Satterlee and Finucane with Stromberg, whereby the latter was to go into the new company and have a large interest therein, he entered into a service contract with the New York com-

pany for ten years. Satterlee never had any conversation with appellant in regard to this stock, and the agreement with Stromberg was, that the stock was to be issued to the latter in consideration of the covenants of his service contract and of his acting as a director of the New York corporation. There was never any understanding that appellant was to receive any of the stock in consideration of his executing the service contract or as a retainer for future legal services. Afterward, Stromberg voluntarily agreed to turn over to appellant the shares which were issued to appellant, in appreciation of the latter's friendship and the invaluable aid which Stromberg and his company had always received in the time when their necessities were great and their resources small. The stock contract was executed as a matter of form, to provide for the issue directly to appellant of the stock Stromberg intended for him, instead of its issue to Stromberg and assignment by him to appellant.

The burden of proof was upon appellees to prove their case by a preponderance of the evidence. It is manifest that the stock contract does not truly state the agreement between the parties as to the consideration. All who were acquainted with the circumstances attending its execution agree in this, and while their evidence is at variance with the writing itself, we think the statement of the consideration contained in the contract is overcome. The circumstances of the transaction, in view of all the evidence and in spite of some contradictory statements and of the evasions and want of frankness of appellant and Stromberg, do not indicate that the stock was issued to appellant as a retainer for future services. It satisfactorily appears that it was not issued for past services in the scope of the partnership business. The appellees have therefore no right to call upon appellant to account to them for its value.

Though the book-keeper testified that the books showed that the appellee Cragg had overdrawn his account $1007.86 on September 18, 1902, such evidence is insufficient to sus-

tain appellant's claim that a decree for that amount should be rendered in the appellant's favor. The books themselves were not offered in evidence, nor was proof offered of their contents nor any evidence of their correctness.

The judgment of the Appellate Court and the decree of the superior court will be reversed and the cause remanded to the superior court, with directions to dismiss both the bill and cross-bill at the cost of the appellees, except $350 of the receiver's fees to be paid by the appellant.

*Reversed and remanded, with directions.*